RENDERED: NOVEMBER 22, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0914-WC

CECELIA MACK                                              APPELLANT


v.             PETITION FOR REVIEW OF A DECISION
OF THE WORKERS' COMPENSATION BOARD
ACTION NOS. WC-21-00261 AND WC-23-00257


JUNE JEANES (DECEASED) C/O IVA
JEANES-FRANK; HONORABLE
KIMBERLY O'BRYAN,
ADMINISTRATIVE LAW JUDGE;
HONORABLE MONICA RICE-
SMITH, ADMINISTRATIVE LAW
JUDGE; UNINSURED EMPLOYERS'
FUND; AND WORKERS'
COMPENSATION BOARD                                  APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE: COMBS, LAMBERT, AND McNEILL, JUDGES.

COMBS, JUDGE: This appeal arises from a Workers' Compensation case. The

sole issue before us is whether the Workers' Compensation Board erred in

affirming the decision of the Administrative Law Judge (ALJ) that the Appellant was an independent contractor and that the Appellee was not her employer. After our review, we affirm.

## The First Form 101

At the time of her injury, Appellant, Cecelia Mack (Mack) was providing in-home personal care for June James, the mother of Iva Jeanes-Frank. June Jeanes, the patient, died on December 7, 2020.

Mack alleged that on September 28, 2020, her left foot was injured by the patient's (June's) wheelchair. On February 19, 2021, she filed an Application for Resolution of Injury Claim (Form 101) against Iva Jeanes-Frank (Jeanes-Frank) and the Uninsured Employers' Fund (UEF), Appellees herein. Accompanying that Form 101 is an October 20, 2020, Office Visit Note from Norton Healthcare/Dr. Dripchak, which reflects the following history: "Date of injury/location: October 6, while performing private duty nursing, her client was sitting in wheelchair, used her foot to propel her backwards towards Ms. Mack and struck her on the side of her left leg."

On May 18, 2021, the UEF deposed Mack. Mack testified about her past work history, which included working as a certified nursing assistant as well as various in-home care jobs. She was a full-time student from 2015-2019 studying early childhood education. She graduated in 2019.

Jeanes-Frank came into contact with Mack by means of the Internet. She met with Jeanes-Frank at her mother's home. According to Mack, Jeanes-Frank "asked me could I work for her mother and that I would work five days with two days off. And I said that would be fine." Jeanes-Frank said that she paid Mack $180.00 per day. Mack testified that Jeanes-Frank gave her two pieces of paper to fill out. Mack testified that Jeanes-Frank paid her by personal checks from her mother's account. Mack did not pay taxes on what Jeanes-Frank paid her "because I'm assuming that she was paying my taxes . . . when she had me fill the paperwork out." However, Mack did not receive any tax documents such as a W-2 or 1099. Mack testified that she considered Jeanes-Frank her boss.

When Mack was asked about a Genworth Life Insurance Company form captioned "Independent Care Provider Form," she answered as follows:

> Q. If we go up to the top, you're being referred to as an independent care provider. That means working for yourself, correct?
>
> A. Correct. I see that now, yes.
>
> Q. Okay. So there were no tax reporting responsibilities because you were working for yourself, correct?
>
> A. Correct.
>
> Q. Now, when you were getting paid, you were being paid via check drawn off of Ms. Jeanes' checking account, correct?

A. Yes.

Mack initially acknowledged her signature on the form, dated July 21, 2020.

On September 28, 2021, Mack filed a motion to bifurcate on the issues of work-relatedness and whether an employment relationship existed. Later in 2021, Mack's counsel filed a motion to withdraw -- as well as a motion that Mack be permitted to withdraw her claim without prejudice. By order entered on January 4, 2022, the claim was dismissed without prejudice.

**The Second Form 101**

On July 15, 2022, Mack, by her new counsel, filed a new Form 101 against Jeanes-Frank, alleging a September 28, 2020, injury when a wheelchair rolled onto her left foot/ankle.

On November 9, 2022, Jeanes-Frank deposed Dawn Batainah, who had also cared for her mother. Batainah testified that June Jeanes "was a client I took care of in her own home . . . ." Batainah explained that she was to be paid as an "independent contractor." Jeanes-Frank deposited Batainah's pay directly to her bank account. Batainah never had taxes withheld when she was working in caregiving situations in private homes. While Batainah was June Jeanes's caretaker, she able to coordinate her own schedule. Batainah was asked, "When [June] Jeanes asked you to do something, did you have to clear it with Iva [Jeanes] Frank?" Batainah testified, "Absolutely not."

On December 9, 2022, Jeanes-Frank deposed Marion Lay. Lay cared for June Jeanes from June 2020 until her death on December 7, 2020. Iva Jeanes-Frank directly deposited payment into Lay's checking account. Taxes were not withheld, nor did Jeanes-Frank represent that she would pay taxes. Lay testified that she paid her own taxes.

Jeanes-Frank also deposed Sandra Stiles. Stiles testified that she sat with June Jeanes for more than a year, beginning in approximately June 2019. Stiles moved into the home and lived with June Jeanes. Stiles testified that she was "paid weekly as an independent contractor." Stiles testified that "it was a rate paid by the insurance company, and then, a paper was sent to the insurance company." Stiles paid her own taxes on that money; no taxes were withheld. Stiles testified that if she needed time off to do something, Lay was her "fill-in person." Stiles did not need permission from Jeanes-Frank to take time off.

On January 6, 2023, Iva Jeanes-Frank testified by deposition on her own behalf. At that time she was 75 years of age. Jeanes-Frank testified that her mother was 93 years of age at the time of her death. Her mother had required companion care off and on since 2015 after she was diagnosed with cancer and a back injury. Asked about her mother's mental condition at the time of her death, Jeanes-Frank testified that her mother was never senile; although she had some trouble remembering things at night due to "Sundowners," she always knew pretty

much what was going on around her.  Jeanes-Frank testified that her mother was able to communicate to give directions concerning her care.

Jeanes-Frank explained that her mother had a long-term health policy from Genworth which she had purchased when she retired from Bell Telephone Company in the 1970s:

> **SHE AND A LOT OF LADIES THAT WORKED FOR BELL ALL PURCHASED LONG-TERM HEALTH CARE POLICIES WHICH THEY CONTINUED TO PAY FOR, AND MY MOTHER CONTINUED TO PAY FOR IT EVEN WHEN SHE WAS RECEIVING SERVICES FROM GENWORTH.  SO THERE WAS AN ANNUAL FEE FOR THE GENWORTH LONG-TERM HEALTH CARE POLICY.**
>
> . . .
>
> **THE WAGES OR THE INCOME THAT EACH INDEPENDENT CONTRACTOR WAS GIVEN CAME FROM THE BILLING TO THE GENWORTH HEALTH CARE POLICY, SO. . .**
>
> . . .
>
> **GENWORTH SENT A CHECK MONTHLY TO MY MOTHER.  IT WAS MADE OUT TO HER, AND THIS WAS DEPOSITED IN THE CHECKING ACCOUNT, AND ALL OF THE PAY WAS ISSUED THROUGH MY MOTHER'S CHECKING ACCOUNT.**
>
> . . .
>
> **THE FLAT RATE FROM GENWORTH WAS $172 A DAY, AND THEY WERE GIVEN THE FULL**

> **AMOUNT FOR ANY 24-HOUR PERIOD THAT
> THEY WORKED.**
>
> . . .
>
> Q. DID YOU-ALL WITHHOLD ANY TAXES?
>
> **A. NO.**

(Bold-face and upper case original.)  Jeanes-Frank explained that Genworth Insurance issued a 1099 to her mother, which was filed with her mother's tax forms:

> **AND FOR EVERY PENNY SHE RECEIVED,
> EVERY PENNY WAS PAID OUT.  THERE WAS
> NOT AN EXCESS OF EVEN A NICKEL.  SO ALL
> OF THAT MONEY WAS CLAIMED ON HER
> TAXES**.
>
> . . .
>
> **A. IT WAS AN OVERSIGHT ON MY PART
> NOT TO ISSUE THE 1099'S, BUT EVERYBODY
> UNDERSTOOD THEY WERE AN INDEPENDENT
> CONTRACTOR.  THEY WERE REQUIRED TO
> FILE FOR THEIR INCOME.**

(Bold-face and upper case original.)  Jeanes-Frank further testified that Mack completed a form for Genworth -- as did all the other caregivers.[1]

---

[1] The record below includes copies of the following documents subsequently filed by Jeanes-Frank:  1099-LTC sent by Genworth to the Estate of June M. Jeanes showing gross long-term care benefits paid in the amount of $60,175.00 for the calendar year 2020; Jeanes's checking account statements showing deposits from Genworth; the "Independent Care Provider Form from Genworth Life Insurance Company" completed by Mack; billings sent to Genworth on Genworth forms entitled "Invoice of Independent Health Care Provider" for Mack; and checks paid to Mack drawn on June Jeanes's bank account.

Jeanes-Frank coordinated the schedule among the caregivers, but they themselves actually determined what days they would work based upon their availability. Jeanes-Frank did the shopping for groceries, which were provided at her mother's expense, and the caregivers would call if they needed anything. According to Jeanes-Frank, the caregivers understood that they were to prepare whatever her mother wanted to eat. Jeanes-Frank did not set any menu requirements. Asked how she knew Cecelia Mack, Jeanes-Frank testified that she had used the Care.com website. She called people who advertised on the website as caretakers. Mack learned about the job from a friend and came to the premises answering Jeanes-Frank's request.

After Jeanes-Frank testified, Mack sought leave to amend her Form 101 to name the Estate of June Jeanes as a party Defendant. In her January 9, 2023, motion, Mack explained that "there has been testimony by Iva Jeanes-Frank that she paid the plaintiff wages for services with checks drawn upon the account of her late mother June Jeanes."

Jeanes-Frank timely filed an objection, arguing that the Estate *per se* was not an entity which can sue or be sued in Kentucky. Additionally, the order of final settlement had been issued in the probate case, Jefferson District Court Case No. 21-P-001427, on November 23, 2021 -- at least seven months **before** Mack filed the second Form 101.

On February 17, 2023, the ALJ denied Mack's motion, noting that "Plaintiff seeks an order amending the Form 101 to allege a work-related injury in the course and scope of her employment with a different entity. As such, this ALJ concludes Plaintiff must file a new Form 101."

**The Third Form 101**

On March 8, 2023, Mack filed a new Form 101 naming "June Jeans(dec)C/O Iva JeanesFrank" [*sic*] as the Defendant/Employer. On March 15, 2023, Mack filed a motion to consolidate the two claims. Jeanes-Frank again filed an objection. By Order entered July 12, 2023, the ALJ consolidated the two claims. On October 19, 2023, Mack filed a motion seeking to dismiss "June Jeans(Dec)" as a party without prejudice and bifurcating the issue of whether or not Mack was an employee or an independent contractor. On October 31, 2023, the ALJ rendered an order granting the motion to dismiss and ordered that "June Jeans is **DISMISSED** without prejudice." (Emphasis original.) By separate order, the ALJ granted the motion to bifurcate on the issue of whether Mack was an independent contractor.

**The ALJ's Opinion and Order**

On December 22, 2023, ALJ Monica Rice Smith rendered an Opinion and Order dismissing, having concluded that Mack failed to prove an employee/employer relationship with Iva Jeanes-Frank under the Workers'

Compensation Act, KRS[2] Chapter 342. The ALJ explained that Mack completed a form indicating that she was an independent care provider. Jeanes-Frank was not operating any type of business -- much less one providing personal care for the elderly. In addition, Batainah and Lay, who both had extensive caregiving experience, testified that when providing care for private individuals, taxes were never withheld. The ALJ determined that although Jeanes-Frank bought food and household supplies and visited regularly, Mack worked independently and was in control of the details of everyday activities. Additionally, although Jeanes-Frank kept track of the work schedule, Stiles, Batainah, and Lay all confirmed that they were free to adjust the schedule among themselves as needed. There was no evidence that the caregivers were prevented from working for others on their off-days. Although Mack testified that she believed Frank was withholding taxes, the amount of Mack's paychecks did not reflect that assertion.

On December 26, 2023, Mack filed a petition for reconsideration. On January 5, 2024, the claim was reassigned to ALJ Kimberly O'Bryan.

**The ALJ's Order on Reconsideration**

By Order entered on January 23, 2024, ALJ O'Bryan stated that "[a]fter reviewing Mack's petition for reconsideration, I find it is an impermissible re-argument of the merits; therefore, it is denied. However, I am providing

---

[2] Kentucky Revised Statutes.

-10-

additional findings of fact about Mack's status as an independent contractor." The

ALJ explained as follows:

> In *Oufafa v. Taxi, LLC*, 664 S.W.3d 592, 599 (Ky. 2023), Kentucky's Supreme Court adopted the economic realities test for determining a claimant's employment status. The test has six factors:
>
> 1. The permanency of the relationship between the parties,
>
> 2. The degree of skill required for the rendering of services,
>
> 3. The worker's investment in equipment or materials for the task,
>
> 4. The worker's opportunity for profit or loss, depending upon his skill,
>
> 5. The degree of the alleged employer's right to control the way the work is performed, and
>
> 6. Whether the service rendered is an integral part of the alleged employer's business.
>
> In *Oufafa*, the Court explained the central question in the economic realities test is determining "the worker's economic dependence upon the business for which he is laboring." *Id.* Here, the economic realities test supports the prior ALJ's finding that Mack was an independent contractor.

ALJ O'Bryan made additional, detailed findings regarding each of the

six factors and in summary concluded as follows:

> Using the economic realities test, the evidence weighs in favor of Mack's status as an independent

-11-

contractor. She was in business for herself. She selected the timing and duration of her shifts, determined how she would perform her duties, and had great discretion in her ability to work as much or as little as desired. There was no exclusivity in her arrangement with Jeanes-Frank, and Mack's position was temporary in nature with an imminent and definable end date. Either party was free to terminate the arrangement at any time and there was no expectation of substantially advanced notice for her decision to decline further shifts.

Thus, under an analysis of the controlling factors set forth in *Oufafa*, [*sic*]confirms the prior ALJ's finding that Mack was an independent contractor and not an employee. Thus, Mack's petition for reconsideration is denied.

### The Board's Opinion

Mack appealed to the Board, which unanimously affirmed in a 69-page Opinion entered on June 21, 2024, as follows in relevant part:

[T]he testimony of Batainah, Stiles, and Lay establish Jeanes-Frank did not possess much supervisory powers and there was no need for certification as a caregiver. The caregivers unanimously testified, that even though they were hired by Jeanes-Frank and took some directives from her, they performed their tasks based on Jeanes' desires. As previously noted, Batainah testified she cared for and worked for Jeanes. The testimony of both Stiles and Lay support Batainah's testimony. More importantly, the three agreed they were able to set the hours they worked as caregivers and had the ability to obtain replacements so long as Jeanes was cared for by one of the individuals with whom Jeanes was comfortable. Notably, their only obligation to Jeanes-Frank was to notify her when a replacement caregiver for her mother was to be present. The "Independent Care Provider" form, although not entirely dispositive of the

-12-

issue, establishes Mack was aware that Jeanes and Jeanes-Frank considered her as an independent contractor. Mack's work schedule buttresses this conclusion as she worked intermittently during the period she served as one of Jeanes' caretakers.

Notably, in Oufafa, the Supreme Court referenced the holding in Husman Snack Foods Co. v. Dillion, 591 S.W.2d 701 (Ky. App. 1979) (citing Larson, Workmen's Compensation Laws 43.51 (1978)) elaborating that to serve the purpose of our workers' compensation statutes, the factors set forth in Ratliff v. Redmon, [396 S.W.2d 320 (Ky. App. 1965)], should be construed with an eye toward whether the alleged employee's work formed the basis of the employer's regular business. [*Oufafa*,] Id. at [599]. Here, there is no question Jeanes-Frank was not in the business of supplying caregivers to those physically infirmed. Rather, the sole purpose of this arrangement was to obtain caregivers for her mother. Stated another way, Jeanes-Frank was retired and was not engaged in a business of any type.

Finally, we conclude that under the facts in this case, the evidence overwhelmingly demonstrates Jeanes-Frank was not Mack's employer as the evidence establishes the caregivers provided services to Jeanes and Jeanes paid them. The evidence is also clear the caregivers determined the schedule each was to work in order for Jeanes to have 24-hour care. In addition, there is no question the funds used to pay all of the caregivers came from a policy obtained by Jeanes. The documents filed by Jeanes-Frank on March 14, 2023, reflect Jeanes received a Form 1099-LTC for $60,175.00 from Genworth to be used for long-term care and accelerated death benefits. Those funds were Jeanes' and were paid to her caretakers. Jeanes' bank records also establish she paid the caregivers and not Jeanes-Frank. Although Jeanes-Frank may have written the checks, it was Jeanes' money that went to the caregivers. Thus, at most, Jeanes-Frank's role was as a supervisor and not as an employer. Accordingly, as substantial evidence

-13-

supports both ALJ's decisions and a contrary result is not compelled, this Board must affirm.

In her appeal, Mack contends that the Board erred in affirming the opinions of the ALJs who found that Mack was an independent contractor. Mack essentially reargues her case.

The standard of our review on appeal is long established. "The function of further review of the [Board] in the Court of Appeals is to correct the Board only where [this] Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *Western Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992). We have perceived no such error in the case before us after our careful review of the extensive record.

Accordingly, we affirm the June 21, 2024, Opinion of the Workers' Compensation Board.

ALL CONCUR.

BRIEF FOR APPELLANT:

Ched Jennings
Louisville, Kentucky

BRIEF FOR APPELLEE JUNE JEANES (DECEASED) C/O IVA JEANES-FRANK:

Todd K. Bolus
Louisville, Kentucky